UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

ERIC EDWARD JUELL,

       Plaintiff,

    v.

FOREST PHARMACEUTICALS, INC.
and DAVID WILLIAMS,

       Defendants.

NO. CIV S-05-0378 FCD/GGH

<u>MEMORANDUM AND ORDER</u>

----oo0oo----

    This matter is before the court on defendants' Forest Pharmaceuticals, Inc. ("Forest") and David Williams ("Williams") motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.[1]  Plaintiff Eric Edward Juell ("Juell") opposes defendants' motion.  For the reasons set forth below,[2] defendants' motion is DENIED.

/////

---

[1]    All further references to a "Rule" are to the Federal Rules of Civil Procedure, unless otherwise noted.

[2]    Because oral argument will not be of material assistance, the court orders the matter submitted on the briefs. E.D. Cal. L.R. 78-230(h).

1                         **BACKGROUND**[3]

2        Plaintiff Eric Edward Juell was born on February 8, 1953.

3   (Juell Aff. ¶ 1).  Plaintiff was hired by defendant Forest in

4   June 1991 as a Territory Sales Representative.  (UF ¶ 1).  Forest

5   manufactures and markets various prescription pharmaceutical

6   products throughout the United States.  (UF ¶ 1).  After

7   approximately five years with Forest, plaintiff was promoted to

8   the position of Manager of Specialty Markets ("MSM").  (UF ¶ 2).

9   As an MSM, plaintiff's primary responsibilities were to identify

10  and develop working relationships with HMOs, to contract Forest's

11  pharmaceutical products in a positive formulary position, and to

12  work with Forest's sales force in the field.  (Juell Aff. ¶ 6).

13  Plaintiff was also required to call on HMOs, pharmacy benefit

14  management companies ("PBM"s), and medical groups, communicate in

15  writing and orally with his accounts before and after calling on

16  them, draft reports, communicate with Forest's sales force and

17  upper management, create expense reports, coordinate programs

18  with sales representatives that accentuated Forest's formulary

19  position with HMOs, and work with Forest's sales force to

20

21  ────────────────

22        [3]    For the purposes of this motion, the court recounts
    plaintiff's version of the facts.  (See Pl.'s Separate Stmt. of
23  Undisp. Material Facts ("SDF"), filed Aug. 1, 2006; Aff. of Eric
    Edward Juell ("Juell Aff."), filed Aug. 1, 2006).  While
24  plaintiff titled this document as a separate statement of
    undisputed facts, the court interprets this document as a
25  separate statement of disputed facts filed pursuant to Eastern
    District Local Rule 56-260(b).

26        Where the facts are undisputed, the court refers to the
    parties' statement of undisputed facts.  (See Pl.'s Opp'n to
27  Def.'s Separate Stmt. of Undisp. Facts ("UF"), filed Aug. 1,
    2006).
28

maximize Forest's market share with those markets where Forest had a positive formulary position.  (Juell Aff. ¶ 6).

Plaintiff presents evidence that his job responsibilities began to increase sometime in 2000.  In early 2000, defendant Williams became plaintiff's manager.  (Juell Aff. ¶ 8).  When plaintiff started in the job of MSM, he worked approximately forty to fifty hours per week and was responsible for about eight large accounts.  (Juell Aff. ¶ 9).  By late 2000, he was working over sixty hours per week and was responsible for approximately 20 accounts.  (Juell Aff. ¶ 9).  In 2001, plaintiff had twice as many lives (a number referring to an account's member enrollment) as other MSMs.  (Juell Aff. ¶ 9).  In 2000, due to a vacant Specialty Market Representative ("SMR") position, Williams assigned plaintiff the additional responsibility of calling on medical groups, including some in Southern California.  (Juell Aff. ¶ 8).  Also in 2000, the MSM responsible for all of Southern California, Marcus Shaw, was moved to a new position, and plaintiff was assigned responsibility by Williams to all Southern California HMO accounts and field sales force.  (Juell Aff. ¶ 11).  This assignment increased his accounts from eight to twenty.[4]  (Juell Aff. ¶ 11).  As of 2001, plaintiff had

---

[4]    Defendants assert that Forest's records reflect that plaintiff was assigned only one account of Shaw's, Maxicare.  (UF ¶¶ 41, 43).  Defendants argue that plaintiff does not present any evidence disputing Forest's records.  However, plaintiff states in his declaration that he called on many account in Southern California and Nevada that were formerly in Shaw's territory and attached the corresponding Contact and Activity Reporting System ("CARS") reports.  (Juell Aff. ¶ 56; Ex. 21 to Juell Aff.; UF ¶ 41).  Plaintiff also asserts that the individuals whom defendants identify as taking other accounts of Shaw's were SMRs who assumed
(continued...)

responsibility for 16 divisional managers and 112 representatives. (Juell Aff. ¶ 14). The MSM who held the neighboring territory had responsibility for 9 divisional managers and 56 representatives. (Juell Aff. ¶ 15). Lastly, plaintiff's workload also increased due to his involvement in producing speaker programs designed to increase market share for the antidepressant drug Celexa. (Juell Aff. ¶ 11). From April 2001 to March 2002, plaintiff was the leader in program monies utilized for speaker programs. (Juell Aff. ¶ 11). In order to complete the tasks assigned, plaintiff's wife assisted him in administrative duties, often working forty hours per week. (Juell Aff. ¶ 12). Further, in early 2002, SMRs were relieved of responsibility for calling on medical group accounts, and that responsibility was added to the MSM workload. (Juell Aff. ¶ 7).

In February 2001, plaintiff was promoted to the position of Senior Manager of Specialty Markets ("Senior MSM"). (Juell Aff. ¶ 2). In September 2001, plaintiff informed Williams that he had too many accounts and responsibility for many more divisional managers and representatives than his colleagues. (Juell Aff. ¶ 14). At this time, plaintiff was spending 40% of his time interfacing with Forest sales representatives. (Juell Aff. ¶ 14). Williams told plaintiff that he did not want to hear about it. (Juell Aff. ¶ 14). Plaintiff also spoke to Williams several times throughout 2001-2003 about the unrealistic work load that he had been assigned and its affect on his psychological well

---

[4](...continued)
medical groups, not HMOs. (UF ¶ 43). As such, plaintiff has presented evidence contrary to defendants' assertions.

being.  (Juell Aff. ¶ 16).  On June 5, 2002, plaintiff also
informed Donald MacDonald, Vice-President of Managed Care
Operations for Forest, of his unrealistic workload and that
Williams did not provide him with any managerial support.  (Juell
Aff. ¶ 17; Aff. of Donald MacDonald ("MacDonald Aff."), filed
Aug. 11, 2006).  MacDonald never spoke to plaintiff again
regarding these issues.  (Juell Aff. ¶ 17).

Beginning in approximately late 2001 or early 2002, Williams
made numerous age-related comments to plaintiff every time they
spoke.  (Juell Aff. ¶ 18).  When Williams first made age-related
comments to him, plaintiff thought he was joking.  (SDF ¶ 1).
However, over time, the comments became more frequent and more
degrading.  (Juell Aff. ¶ 18).  Williams made comments about
plaintiff's age during account calls, in peer group settings, and
over the telephone.  (Juell Aff. ¶ 18).  On several account
visits that plaintiff and Williams made together, Williams
implied that there was a question as to whether plaintiff could
still "get the job done" at his age and whether plaintiff's
abilities were waning.  (Juell Aff. ¶¶ 18, 20).  Specifically,
plaintiff recalls Williams mentioning his age with a negative
connotation during account calls to Blue Shield of California,
Catalyst RX, Sierra Health Services, Integrated Pharmaceutical
Services, and Sutter Health.  (Juell Aff. ¶ 18).

Williams would also sent numerous e-mails to plaintiff in
which plaintiff believes he made reference to plaintiff's age.
(SDF ¶ 4).  Williams wrote e-mails to plaintiff wherein he
referred to him as "Senior," "SR.," and "Old manager of specialty
markets."  (SDF ¶ 5; Juell Aff. ¶¶ 21-27).  In one e-mail,

Williams wrote: "I hope that the little old ladies that you met don't start calling you at home – maybe you should refer them onto Marc Shaw – he might be able to get them a great deal on a nursing home community." (Juell Aff. ¶ 27). In another e-mail sent shortly after the birth of his daughter, Williams wrote: "Don't feel bad when the teacher asks if you're the grandfather." (Juell Aff. ¶ 28). Williams also made remarks in other e-mails such as "Hope all is well with my very senior account manager (50 and still ticking)," "Going for the big 15 to go with 50," "bring your cane to the next meeting," and "you are the oldest guy in the department, aren't you?." (Juell Aff. ¶¶ 29-31).

In the fall of 2002, plaintiff had a telephone conversation with Williams wherein Williams told plaintiff that he was golfing with a good friend from his church who had lost his job and who had asked about employment with Forest. (SDF ¶ 6). When plaintiff asked Williams whether he was going to hire his friend, Williams responded that he was not because the man was over fifty and had lost his snap. (SDF ¶ 6). Plaintiff felt that Williams shared this with him as an indirect way of commenting on his age, as this conversation occurred shortly before plaintiff's fiftieth birthday. (SDF ¶ 6; Juell Aff. ¶ 33).

Plaintiff spoke to Forest's Senior Director of Human Resources, Jeff Wolfe ("Wolfe"), approximately five times between January 2002 and April 2003 about his inability to handle all the work that he had been assigned. (Juell Aff. ¶ 36). In May 2002, plaintiff informed Wolfe that Williams was sending e-mails with comments about plaintiff's age and mentioning his age to accounts; plaintiff told Wolfe that he felt like he was the

6

target of age discrimination.  (SDF ¶¶ 12-13).  Plaintiff was
never contacted by any Forest Human Resources representative,
manager, or any other authorized representative of Forest
concerning any investigation into his complaints.  (Juell Aff. ¶
36).  Neither Wolfe nor anyone in Forest's Human Resources
Department took any action to reduce plaintiff's workload or to
investigate whether there was merit to plaintiff's complaints
regarding age discrimination.  (SDF ¶ 21).  Sometime after Summer
2002, Wolfe informed MacDonald that plaintiff had some concerns
about communications from Williams relating to his age.  (SDF ¶
16).  MacDonald thereafter spoke to Williams in general terms and
Williams acknowledged that he may have said some things that were
mis-perceived, but that he would be sensitive to making any kind
of comments that were not work-related.  (SDF ¶¶ 16-17).

    In early 2003, as a result of Williams' focus on his age
along with the heavy workload, plaintiff felt he could no longer
perform the tasks of his job.  (SDF ¶ 22).  Williams' conduct
made it psychologically impossible for plaintiff to continue as
an MSM and to continue under the supervision of Williams.  (SDF ¶
23).  Plaintiff informed Williams that he could no longer perform
the tasks associated with his position, that he was
psychologically and mentally stressed, and that it was impossible
for him to handle the volume of work assigned to him.  (SDF ¶
24).  In April 2003, plaintiff called to inform Wolfe that he was
taking a voluntary demotion because he felt that he had been
forced to resign from his position as Senior MSM due to his age.
(Juell Aff. ¶ 38).  Plaintiff took a position as an office-based
Specialty Representative, which decreased his base salary by

1   $28,000.  (SDF ¶ 26).  Plaintiff would not have taken this
2   position absent the conduct of Williams.  (SDF ¶ 25).  After
3   plaintiff told Williams that he was stepping down from the Senior
4   MSM position, Williams told plaintiff that at his age, that might
5   be good.  (UF ¶ 58).  When plaintiff stepped down from his MSM
6   position in April 2003, he was replaced by Irene Camarino, who
7   was 34 years old in 2003.  (SDF ¶ 37).

8       Plaintiff held the position of Specialty Representative
9   under the supervision of Scott Rogers from April 2003 through
10  July 17, 2003.  (Juell Aff. ¶ 41).  However, the mental distress
11  suffered by plaintiff as an MSM under the supervision of Williams
12  rendered him unable to perform even at the reduced level required
13  of a Specialty Representative.  (Juell Aff. ¶ 41).  As a result
14  of the mental distress, plaintiff had a nervous breakdown and
15  became disabled.  (Juell Aff. ¶ 42).  He took a leave of absence
16  from Forest since July 17, 2003.  As of that date, he remains
17  unable to focus, concentrate, multi-task, or return to work.
18  (Juell Aff. ¶ 42).

19      On January 26, 2005, plaintiff filed a complaint in Nevada
20  County Superior Court against defendants, alleging state claims
21  against defendants Forest and Williams for harassment on the
22  basis of age in violation of California's Fair Employment and
23  Housing Act ("FEHA"), Cal. Gov. Code § 12940, and against
24  defendant Forest for discrimination on the basis of age in
25  violation of FEHA, wrongful termination in violation of public
26  policy and failure to prevent harassment in violation of
27  California Government Code § 12940(k).  Defendants removed the

28

case from state court in February 2005 on the basis of diversity
jurisdiction.

### STANDARD

Summary judgment is appropriate when it is demonstrated that
there exists no genuine issue as to any material fact, and that
the moving party is entitled to judgment as a matter of law.
Fed. R. Civ. P. 56(c); <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144,
157 (1970).

Under summary judgment practice, the moving party

> always bears the initial responsibility of informing
> the district court of the basis of its motion, and
> identifying those portions of "the pleadings,
> depositions, answers to interrogatories, and admissions
> on file together with the affidavits, if any," which it
> believes demonstrate the absence of a genuine issue of
> material fact.

<u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). "[W]here the
nonmoving party will bear the burden of proof at trial on a
dispositive issue, a summary judgment motion may properly be made
in reliance solely on the 'pleadings, depositions, answers to
interrogatories, and admissions on file.'" <u>Id.</u> at 324. Indeed,
summary judgment should be entered against a party who fails to
make a showing sufficient to establish the existence of an
element essential to that party's case, and on which that party
will bear the burden of proof at trial. <u>Id.</u> at 322. In such a
circumstance, summary judgment should be granted, "so long as
whatever is before the district court demonstrates that the
standard for entry of summary judgment, as set forth in Rule 56©,
is satisfied." <u>Id.</u> at 323.

If the moving party meets its initial responsibility, the
burden then shifts to the opposing party to establish that a

9

1  genuine issue as to any material fact actually does exist.

2  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574,

3  585-87 (1986); First Nat'l Bank v. Cities Serv. Co., 391 U.S.

4  253, 288-289 (1968).  In attempting to establish the existence of

5  this factual dispute, the opposing party may not rely upon the

6  denials of its pleadings, but is required to tender evidence of

7  specific facts in the form of affidavits, and/or admissible

8  discovery material, in support of its contention that the dispute

9  exists.  Fed. R. Civ. P. 56(e).  The opposing party must

10 demonstrate that the fact in contention is material, i.e., a fact

11 that might affect the outcome of the suit under the governing

12 law, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986),

13 and that the dispute is genuine, i.e., the evidence is such that

14 a reasonable jury could return a verdict for the nonmoving party,

15 id. at 251-52.

16     In the endeavor to establish the existence of a factual

17 dispute, the opposing party need not establish a material issue

18 of fact conclusively in its favor.  It is sufficient that "the

19 claimed factual dispute be shown to require a jury or judge to

20 resolve the parties' differing versions of the truth at trial."

21 First Nat'l Bank, 391 U.S. at 289.  Thus, the "purpose of summary

22 judgment is to 'pierce the pleadings and to assess the proof in

23 order to see whether there is a genuine need for trial.'"

24 Matsushita, 475 U.S. at 587 (quoting Rule 56(e) advisory

25 committee's note on 1963 amendments).

26     In resolving the summary judgment motion, the court examines

27 the pleadings, depositions, answers to interrogatories, and

28 admissions on file, together with the affidavits, if any.  Rule

56(c); <u>SEC v. Seaboard Corp.</u>, 677 F.2d 1301, 1305-06 (9th Cir.
1982).  The evidence of the opposing party is to be believed, and
all reasonable inferences that may be drawn from the facts placed
before the court must be drawn in favor of the opposing party.
<u>Anderson</u>, 477 U.S. at 255.  Nevertheless, inferences are not
drawn out of the air, and it is the opposing party's obligation
to produce a factual predicate from which the inference may be
drawn.  <u>Richards v. Nielsen Freight Lines</u>, 602 F. Supp. 1224,
1244-45 (E.D. Cal. 1985), <u>aff'd</u>, 810 F.2d 898 (9th Cir. 1987).

Finally, to demonstrate a genuine issue, the opposing party
"must do more than simply show that there is some metaphysical
doubt as to the material facts. . . . Where the record taken as a
whole could not lead a rational trier of fact to find for the
nonmoving party, there is no 'genuine issue for trial.'"
<u>Matsushita</u>, 475 U.S. at 586-87, 106 S. Ct. at 1356.

**ANALYSIS**

**A.   Fair Employment and Housing Act Claims**

Plaintiff brings claims under the Fair Employment and
Housing Act ("FEHA") for discrimination, harassment, and failure
to prevent discrimination on the basis of age.  Defendants move
for summary judgment on the ground that plaintiff has not
produced sufficient evidence to create a triable issue of fact
for violations of FEHA.

FEHA provides that it is "an unlawful employment practice"
for an employer to refuse to hire or employ, to bar or discharge
from employment, or to discriminate against any individual over
the age of 40 in compensation or in terms, conditions, or
privileges of employment on the basis of age.  Cal. Gov. Code §§

11

12926, 12941 (West 2006).  "Although the wording of the Fair
Employment Housing Act and title VII of the Federal Civil Rights
Act of 1964 differs in some particulars, the antidiscriminatory
objectives and the overriding public policy purposes are
identical," and therefore, California courts refer to applicable
federal decisions where appropriate.  Sorosky v. Burroughs Corp.,
826 F.2d 794, 803 (9th Cir. 1987) (citing County of Alameda v.
Fair Employment & Hous. Comm'n, 153 Cal. App. 3d 499, 504 (1984);
Guz v. Bechtel Nat'l, Inc., 24 Cal. 4th 317, 354 (2000).  "In
particular, California has adopted the three-stage
burden-shifting test established by the United States Supreme
Court for trying claims of discrimination, including age
discrimination, based on a theory of disparate treatment.  Guz,
24 Cal. 4th at 354 (citing Texas Dep't of Cmty Affairs v.
Burdine, 450 U.S. 248 (1981); McDonnell Douglas Corp. v. Green,
411 U.S. 792 (1973); Martin v. Lockheed Missiles & Space Co., 29
Cal. App. 4th 1718, 1730 (1994); Ewing v. Gill Indus., Inc., 3
Cal. App. 4th 601, 610-11 (1992); County of Alameda, 153 Cal.
App. 3d 499, 504 (1984)).

### 1.   Discrimination Claims

     Plaintiff asserts that defendant Forest discriminated
against him based upon his age as evidenced by derogatory
age-related comments, a heavier workload than younger employees,
a corporate ageist culture, and eventual replacement by a younger
employee.  Plaintiff contends that defendant's conduct made it
psychologically impossible for him to continue working in his
position, and that he was forced to demote himself and then
eventually, to take a disability leave from his employment with

Forest.  Defendant asserts that plaintiff cannot set forth a claim that he was discriminated against on the basis of age.

To establish a case of age discrimination in violation of FEHA, plaintiff must prove (1) he was a member of a protected class; (2) he was performing competently in the position he held; (3) he suffered an adverse employment action, such as termination, demotion, or denial of an available job; and (4) some other circumstance suggests discriminatory motive.[5]  Guz, 24 Cal. 4th at 355 (citations omitted).  Under McDonnell Douglass, once the plaintiff makes out a prima facie case of discrimination, the burden shifts to the defendant to set forth a legitimate, non-retaliatory reason for the adverse action.  Id. at 355-56.  However, only the burden of production shifts; the ultimate burden of persuasion remains with the plaintiff. Burdine, 450 U.S. at 253.  If the defendant can make this showing, the burden shifts back to the plaintiff to "attack the employer's proffered reasons as pretexts for discrimination, or to offer any other evidence of discriminatory motive.  Guz, 24 Cal. 4th at 356 (citing St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515-18 (1993)).

---

[5]  Defendant, citing an unpublished opinion from the Northern District of California, mistakenly asserts that the fourth prima facie element requires that defendant show that employees outside the protected age class were treated differently.  While this type of showing may circumstantially demonstrate discriminatory intent, in Guz, the California Supreme Court set forth that the fourth element of a prima facie case requires plaintiff to demonstrate some other circumstance which suggests discriminatory motive, not necessarily that other employees outside of the protected age class were not treated similarly.  24 Cal. 4th at 355.

1   Defendant Forest does not dispute that plaintiff was a
2  member of a protected class or that he was performing competently
3  in his position.  (See UF ¶¶ 6-15; Defs.' Mem. of P.&A. in Supp.
4  of Mot. for Summ. J., filed June 20, 2006, at 11).  Rather,
5  defendant argues that plaintiff fails to demonstrate (1) that he
6  experienced an adverse employment action on a theory of
7  constructive discharge; (2) that defendant had discriminatory
8  motives for their conduct; and (3) that defendant's legitimate,
9  non-discriminatory reasons for their conduct was merely a pretext
10 for discrimination on the basis of age.

11               **a.  Constructive Discharge**

12  Defendant Forest contends that plaintiff cannot establish a
13 prima facie claim of age discrimination because he did not
14 experience an adverse employment action.  Plaintiff argues that
15 he was constructively discharged from his employment as a Senior
16 MSM with Forest.

17  The doctrine of constructive discharge seeks to address the
18 situation where, "[i]n an attempt to avoid liability for
19 wrongfully discharging an employee, an employer may refrain from
20 actually firing an employee, preferring instead to engage in
21 conduct causing him or her to quit."  Colores v. Bd. of Trs., 105
22 Cal. App. 4th 1293, 1305 (2003) (quoting Turner v. Anheuser-
23 Busch, Inc., 7 Cal. 4th 1238, 1244-45 (1994)).  As a result, in
24 order to prevent "end-runs" around claims requiring employer-
25 initiated terminations of employment, "a constructive discharge
26 is legally regarded as a firing rather than a resignation."  See
27 id. (quoting Turner, 7 Cal. 4th at 1244-45).  The standard by
28 which a constructive discharge is determined is "whether a

reasonable person faced with the allegedly intolerable employer
actions or conditions of employment would have no reasonable
alternative except to quit."  Id. (quoting Turner, 7 Cal. 4th at
1248).  In order to establish a constructive discharge, a
plaintiff must show that "the employer either intentionally
created or knowingly permitted working conditions that were so
intolerable or aggravated at the time of the employee's
resignation that a reasonable employer would realize that a
reasonable person in the employee's position would be compelled
to resign."  Id. at 1305 (quoting Turner, 7 Cal. 4th at 1251).
For purposes of constituting constructive discharge, the "adverse
working conditions must be unusually 'aggravated' or amount to a
'continuous pattern' before the situation will be deemed
intolerable."  Id. at 1306.

       Plaintiff's constructive discharge claim is based upon his
resignation from the Senior MSM position and acceptance of the
Specialty Representative position, which decreased his base
salary from $108,000 to $80,000.  Plaintiff contends that his
working conditions, specifically the combination of an
unmanageable workload along with frequent and degrading comments
by his supervisor Williams, forced him to resign from his
position as Senior MSM.  However, in an effort to continue some
employment, plaintiff took the position of Specialty
Representative under a different supervisor.  See Colores, 105
Cal. App. 4th at 1318 (finding that although the plaintiff did
not technically quit, she still had a claim for constructive
discharge because the true logic of plaintiff's case was that her
employer, through its agents, made plaintiff's working conditions

15

so intolerable that "she was no longer able to function in her duties and *needed to remove herself from her job*, and thus was *effectively* constructive discharged").

Defendant Forest asserts that plaintiff was not constructively discharged because his working conditions were not objectively intolerable.  Specifically, defendant contends that (1) plaintiff's job responsibilities were commensurate with other MSMs; (2) plaintiff received above-average performance reviews, promotions, bonuses, and stock options; (3) plaintiff was paid a six-figure salary; and (4) plaintiff was meeting all performance expectations.

However, there is a factual dispute regarding whether plaintiff's job responsibilities were commensurate with other MSMs.  Defendant contends that the number of accounts assigned to plaintiff was in line with other MSMs and that Forest management otherwise did not substantiate plaintiff's allegations that his workload was unmanageable or that plaintiff had more responsibilities than other MSMs.  (See UF ¶ 38).  Plaintiff presents evidence that he had 16 division managers and 112 sales representatives with whom he was required to communicate, collaborate, and educate, while another MSM in a neighboring territory had 9 division managers and 56 sales representatives. (Juell Aff. ¶ 15).  Also, in late 2000, plaintiff's accounts increased from eight to twenty.  (Juell Aff. ¶ 11).  Plaintiff also presents evidence that he did 28 large speaking programs from November 2000 to October 2001 and was the leader in program monies utilized between April 2001 and March 2002.  (Juell Aff. ¶ 11).  Because of the increased workload and responsibility,

16

plaintiff's wife assisted him in his administrative duties, often working forty hours per week.  (Juell Aff. ¶ 12).  In February 2001, defendant Williams stated that plaintiff had one of the highest Celexa[6] market shares and dollar volume territories in the country and that he had a consistently high call average. (Juell Aff. ¶ 13).  Plaintiff also presents evidence that he had approximately twice as many lives (a number referring to an account's member enrollment) as other MSMs.  (UF ¶ 38). Plaintiff testified at his deposition that, although the process was the same, the effect of a formulary position on a larger number of lives would sometimes dictate how much time plaintiff would spend per account.  (Dep. of Eric Edward Juell ("Juell Dep."), lodged Aug. 1, 2006, 25:14-26:6).[7]  As such, there are triable issues with respect to whether plaintiff's workload was commensurate with other MSMs.

---

[6]      Celexa is an anti-depressant drug marketed by defendant Forest for which plaintiff had to design speaker programs. (Juell Aff. ¶ 11).

[7]      Defendant also points out that plaintiff testified at his deposition that he did not try to devote more time to the accounts that affected more lives.  (Juell Dep. at 27:18-20). Defendant asserts that the court should not consider the number of lives plaintiff was responsible for in assessing his workload because of this statement.  See Block v. City of Los Angeles, 253 F.3d 410, 419 n.2 (9th Cir. 2001) ("A party cannot create a genuine issue of material fact to survive summary judgment by contradicting his earlier versions of the facts.").  However, plaintiff testified that the number of lives affected by a formulary position would sometimes dictate the number of time he spent on an account.  This is not necessarily inconsistent with his statement that he did not try to devote more time to the accounts that affected more lives.  See Messick v. Horizon Indus., Inc., 62 F.3d 1227, 1231 (9th Cir. 1995) ("[T]he non-moving party is not precluded from elaborating upon, explaining, or clarifying prior testimony elicited by opposing counsel on deposition.").

1    Defendant's assertions that plaintiff received above-average
2  performance reviews, promotions, bonuses, and stock options, was
3  paid a six-figure salary, and was meeting all performance
4  expectations is not disputed.  (UF ¶ 50; SUF ¶ 26; Juell Aff. ¶
5  12).  However, the fact that plaintiff was able to competently
6  perform his job and meet expectations does not prevent him from
7  asserting that his working conditions were intolerable such that
8  a reasonable person faced with these conditions would have felt
9  compelled to resign.  See Colores, 105 Cal. App. 4th at 1307.  In
10 Colores, the plaintiff had worked for her employer for over 21
11 years.  Id.  During her entire career, her performance reviews
12 rated her commendable to outstanding, she received progressive
13 salary increases that were consistent with her excellent work,
14 and she had a reputation for honesty, integrity, competence, and
15 for accomplishing difficult projects on time and under budget.
16 Id.  Nevertheless, based upon the conduct of her supervisor, her
17 impossible workload, and the overall atmosphere at her workplace,
18 the court found that plaintiff had raised a triable issue of fact
19 as to whether she was constructively discharged.  Id. at 1308-11.

20   In this case, plaintiff has raised similar claims to that of
21 the plaintiff in Colores.  As set forth above, plaintiff has
22 presented evidence that he was given excessive responsibilities
23 that could not be completed by one person.  See id at 1310.  In
24 order to complete this work, plaintiff's wife assisted him, often
25 working forty hours per week.  However, plaintiff admits that it
26 was not the excessive responsibilities by themselves that caused
27
28

1  him to step down from the MSM position.  (UF ¶ 60[8]).  Rather,

2  plaintiff asserts that the combination of the workload with

3  defendant William's comments and conduct relating to his age that

4  made his workplace conditions intolerable, such that he felt he

5  could no longer perform the tasks of his job.  (SUF ¶ 22).

6  Plaintiff presents evidence that beginning in late 2001 to early

7  2002, defendant Williams made numerous age-related comments to

8  him every time they spoke.  (Juell Aff. ¶ 18).  Over time, the

9  comments became more frequent and degrading.  (Id.)  The comments

10 were made not only to plaintiff in person, but also during

11 account calls, in peer group situations, in social settings, over

12 the telephone, and in e-mails sent to plaintiff and others.

13 Plaintiff presents evidence that Williams implied to clients that

14 plaintiff's abilities may be suspect because of his age.  (Juell

15 Aff. ¶ 19).  Williams focus on plaintiff's age negatively

16 affected plaintiff's mental, physical, and psychological

17 condition.  (UF ¶ 14); see Colores, 105 Cal. App. 4th at 1309.

18 As such, plaintiff has presented sufficient evidence to raise a

19 triable issue of fact regarding whether his working conditions

20 were objectively intolerable.

21

22

23  [8]    At his deposition, plaintiff testified as follows:

24     Q.    Had David [Williams] not made the comments about your
            age, would you have had to step down from the MSM
            position?
25     A.    If he had not?
       Q.    Yes.
26     A.    Probably not.
       Q.    Okay.
27     A.    I don't think so.

28 (Juell Dep. at 120:25-121:6).

                                  19

Defendant Forest argues that even if plaintiff's evidence creates a triable issue that at some point his workload was unmanageable, his workload became manageable once two other Forest Employees, Caroline Gerbis and Sanjay Gupta, became MSMs in California.  Defendant argues that because plaintiff's workload became manageable before he resigned from the position of MSM, plaintiff does not have a claim for constructive discharge.  (Def's Mem. P.&A. in Supp. of Mot. for Summ. J., filed June 20, 2006, at 12) (citing Montero v. AGCO Corp., 192 F.3d 856, 861 (9th Cir. 1999) (holding that the plaintiff was not constructively discharged in part because the offensive conduct had ceased 3-4 months before resignation)).  Defendant Forest contends that plaintiff admitted that his workload became manageable again once Gerbis and Gupta became MSMs.  (See UF ¶¶ 45, 49).

Plaintiff did not concede that his workload became manageable once Gerbis and Gupta were added to his area.  Rather, plaintiff testified that their addition to the area did not ease his job responsibilities.  (Juell Dep. at 54:24-55:1).  Plaintiff also presents evidence that when Gerbis and Gupta were assigned to the area, he was placed on the Medi-Cal account, which was at least equal if not greater to his responsibilities in Southern California.  (Juell Aff. ¶ 52).[9]  Defendant therefore argues that

---

[9]    Defendant asserts that the court should not consider plaintiff's evidence regarding the responsibilities associated with the Medi-Cal account because plaintiff "never once indicated Medi-Cal" at his deposition that this was a reason for why his workload was too great.  (Defs.' Reply Mem. in Supp. of Mot. for Summ. J. ("Reply"), filed Aug. 11, 2006, at 3).  This assertion
(continued...)

1  plaintiff acknowledged in his Complaint that he no longer had
2  responsibility for the Medi-Cal account as of October 2002, and
3  thus, the responsibility ended five months before plaintiff
4  stepped down from the MSM position.  However, plaintiff presents
5  evidence that, for a multitude of reasons, his workload was
6  unmanageable up until the time he stepped down.  The fact that he
7  was relieved of responsibility from one of his accounts does not
8  rebut this assertion.

9      Finally, defendant consistently attempts to treat
10  plaintiff's allegations about his workload as somehow separate
11  and distinct from his allegations about Williams' comments.
12  However, plaintiff's claim of an intolerable working environment
13  are based upon the conjunction of <u>both</u> an unmanageable workload
14  and offensive, age-related comments by his direct supervisor.
15  Plaintiff has presented sufficient evidence to raise a triable
16  issue of fact that the combination of these factors gave rise to
17  objectively intolerable working conditions that existed up until
18  the time he felt he was forced to resign from his position as
19  Senior MSM.
20  /////
21  /////
22  /////
23  /////
24  /////
25
26      [9](...continued)
    is inaccurate.  Plaintiff testified that an increase in accounts
27  caused his job to become problematic.  (Juell Dep. 61:13-21).
    Plaintiff also identified the Medi-Cal account as an account that
28  was added.  (Juell Dep. 51:22-23).  <u>See</u> <u>Messick</u>, 62 F.3d at 1231.

21

1

### b. **Discriminatory Motive**[10]

2    Defendant Forest also contends that plaintiff cannot

3 demonstrate that Williams intended to create intolerable working

4 conditions or had a discriminatory motive for his conduct.

5 Defendant argues that the same-actor inference analogously

6 applies to this situation because Williams gave plaintiff above-

7 average performance reviews[11] and recommended him for a promotion

8 and raises.  The Ninth Circuit has held that "where the same

9 actor is responsible for both the hiring and firing of a

10 discrimination plaintiff, and both actions occur within a short

11 period of time, a strong inference arises that there was no

12 discriminatory action."  Bradley v. Harcourt, Brace & Co., 104

13 F.3d 267, 270-71 (9th Cir. 1996).  The same-actor inference is

14 based upon the principle that "an employer's initial willingness

15 to hire the employee-plaintiff is strong evidence that the

16

17        [10]   Defendant asserts that plaintiff has failed to
establish a prima facie case because he has not presented
18 evidence that individuals outside the protected class were
treated differently than him.  As an initial matter, this is not
19 the fourth element of a prima facie case of age discrimination
under FEHA as set forth by the California Supreme Court in Guz.
20 Rather, plaintiff must demonstrate some circumstance
demonstrating discriminatory motive, see Guz, 24 Cal. 4th at 355,
21 which the court discusses infra.  However, to the extent that
defendant asserts that plaintiff has not shown that he was
22 treated differently, defendant is mistaken.  As set forth above,
plaintiff has presented evidence to create a triable issue of
23 fact that he had more work responsibilities than other MSMs.

24        [11]   Defendant's argument that Williams continually gave
plaintiff positive reviews is somewhat at odds with the evidence
25 they cite in their statement of undisputed facts.  Defendants
assert that plaintiff received ratings in administrative skills
26 as standard or between below standard and standard.  (UF ¶¶ 11-
15).  However, plaintiff disputes this characterization of the
27 rating and asserts that his ratings in the administration
category were standard or above standard.  As such, defendants'
28 incongruous assertions are confusing, but ultimately, do not
affect the court's analysis of this issue.

1   employer is not biased against the protected class to which the

2   employee belongs."  Coghlan v. Am. Seafoods Co. LLC, 413 F.3d

3   1090, 1096 (9th Cir. 2005).  The Ninth Circuit has also recently

4   held that the logic of the same-actor inference equally applies

5   to cases where the plaintiff was not fired, but merely offered a

6   less desirable job assignment.  Id.  "The same-actor inference is

7   neither a mandatory presumption . . . nor a mere possible

8   conclusion for the jury to draw . . . .  Rather, it is a 'strong

9   inference' that a court must take into account on a summary

10  judgment motion."  Id. at 1098.  Once the same-actor inference is

11  raised, the court must consider whether a plaintiff has made out

12  the strong case of bias necessary to overcome this inference.

13  Id.  "[W]hen the allegedly discriminatory actor is someone who

14  has previously selected the plaintiff for favorable treatment,

15  that is very strong evidence that the actor holds no

16  discriminatory animus, and the plaintiff must present

17  correspondingly stronger evidence of bias in order to prevail."

18  Id. at 1097 n.10.

19       Plaintiff disputes that the same-actor inference should

20  apply in this case.  Defendant Forest contends that Williams

21  recommended plaintiff to the position of Senior MSM, gave him

22  positive reviews, and gave him raises and bonuses, thus raising

23  the inference that Williams did not harbor any age-based animus

24  toward plaintiff.  Plaintiff asserts that because the Senior MSM

25  position required maintenance of a 3.5 rating over two years, and

26  because his previous supervisor, Tom Bley, was responsible for

27  two of those evaluations, Williams was not personally responsible

28  for his promotion.  (UF ¶ 18).  Plaintiff therefore argues that

23

1   Williams is not entitled to the same-actor inference.  Defendant

2   has not presented evidence that Williams was the final decision-

3   maker or responsible for plaintiff's promotion.[12]  Nor has

4   defendant offered any case law or support for their proposition

5   that the same actor inference should *analogously* apply in this

6   type of situation.  Cf. <u>Plutt v. Safeway, Inc.</u>, No. CV 05-0384,

7   2006 WL 2091673, at *2 n.1 (D. Ariz. July 25, 2006) (finding that

8   the same actor inference does not apply where the same actor was

9   involved in both decisions, but was not the final decision

10   maker).  The court accordingly cannot conclude that William's

11   participation in recommending plaintiff for a promotion invokes

12   the same actor inference and requires heightened proof by

13   plaintiff.

14        However, even if the court applied the same-actor inference

15   to plaintiff's case, plaintiff has presented sufficient evidence

16   of a strong case of bias necessary to overcome this inference.

17   Plaintiff presents evidence that defendant Williams made

18   consistent comments about his age to him and to others.

19   Plaintiff also presents evidence that Williams made a comment

20   about a friend to plaintiff, stating that he would not hire him

21   because he was over fifty and had lost his snap.  When plaintiff

22   informed Williams that he was stepping down from the MSM

23   position, Williams told plaintiff that at his age that might be

24   good.  Finally, plaintiff was replaced by Irene Camerino, who was

25   34 years old when she took the position.  In light of this

26

27        [12]    Rather, defendant's evidence demonstrates that
     defendant Williams was not ultimately responsible for plaintiff's
     promotion as the memo recommending plaintiff for promotion was
28   sent from Williams to McDonald.  (UF ¶ 17; Ex. N)

24

evidence, plaintiff has raised a triable issue of fact with
regard to defendant Williams' discriminatory intent. <u>See</u> <u>Johnson</u>
<u>v. Boys & Girls Clubs of South Puget Sound</u>, No. 04-35959, 2006 WL
1878615, at *2 (9th Cir. July 6, 2006) (holding that the
defendant's undisputed comments about not understanding the
plaintiff's African-American culture and the hiring of a
Caucasian over a qualified African-American raised a triable
issue of fact regarding discriminatory intent despite the
application of the same actor inference).

### c.   **<u>McDonnell Douglass</u> Burden Shifting Analysis**

As set forth above, plaintiff has sufficiently set forth a
prima facie case of age discrimination because he has presented
evidence that (1) he was a member of a protected class; (2) he
was performing competently in the position he held; (3) he was
constructively discharged from his position as Senior MSM; and
(4) circumstances, such as a greater workload and frequent and
derogatory age-related comments by his supervisor, suggest
discriminatory motive. <u>See</u> <u>Guz</u>, 24 Cal. 4th at 355.  Defendant
Forest argues that even if plaintiff has established a prima
facie case of discrimination, it has produced evidence of
legitimate, non-discriminatory reasons for the conduct.
Specifically, defendant contends that plaintiff was assigned
responsibilities based upon geography, workload, and abilities.[13]
In support of this assertion, defendant Forest points to
plaintiff's statement at his deposition that, at the time, he

---

[13]    Defendant also again asserts that plaintiff was
assigned responsibilities in line with other MSMs.  However, as
set forth above, plaintiff has created a triable issue of fact
that his working conditions were not in line with other MSMs.

felt was given more responsibilities because of his abilities, tenure and experience. (Juell Dep. 86, 89). Defendant also points to the fact that plaintiff always met subjective and objective performance evaluations. (UF ¶ 50[14]). In regards to the age-related comments by Williams, Forest contends that they were "no more than stray remarks."

Even if this evidence is sufficient to support a legitimate, non-discriminatory reason for defendant's conduct, plaintiff has presented sufficient evidence of pretext or discriminatory motive to create a triable issue of fact. At the summary judgment stage, plaintiff's burden is not high. Pottenger v. Potlatch Corp., 329 F.3d 740, 746 (9th Cir. 2003). "He must only show that a rational trier of fact could, on all the evidence, find that [defendant's] explanation was pretextual and that therefore [the] action was taken for impermissibly discriminatory reasons." Id.

As set forth above, plaintiff has presented evidence that he was given work responsibilities greater than any younger MSMs. Further, plaintiff has presented evidence that despite complaints to his immediate supervisor, Williams, to another supervisor, McDonald, and to the Senior Director of Human Resources, Wolfe, nothing was done to alleviate the unrealistic job responsibilities. Plaintiff has also presented evidence that Williams made frequent and derogatory comments about plaintiff's age to plaintiff personally, in social settings, in front of and to clients, and via telephone conversations and e-mails. Based

---

[14] As mentioned above, this assertion contradicts, at least in part, statements made by defendants in ¶¶ 6,9-13, 15.

upon this evidence alone, a rational trier of fact could find

that the employer's actions were taken for impermissibly

discriminatory reasons.  See Messick, 62 F.3d at 1231 (finding a

triable issue of fact of pretext of age discrimination where the

evidence demonstrated, in part, that the plaintiff's supervisor

repeatedly commented to the plaintiff, coworkers, and customers

about plaintiff's age).

Nevertheless, plaintiff also presents evidence supporting

his contention that Forest had a corporate culture that is

hostile to older workers.[15]  Plaintiff presents evidence that

Bley, plaintiff's former supervisor, currently supervises thirty-

nine Divisional Managers, a position at a lateral level to MSMs

who work in managed care, all of whom are younger than fifty

years of age.  (SDF ¶ 31).  Bley also testified at his deposition

that the eleven MSMs that he has met, out of the thirty MSMs at

Forest, are younger than fifty years of age.  (SDF ¶¶ 35-36).

Plaintiff also presents evidence Kevin Collins, a former Forest

SMR, was given a new manager in 2004 who began to say that

Collins and other older Sales Representatives in his area

suffered from "veteranitis."  (Aff. of Kevin Collins, filed Aug.

1, 2006, ¶¶ 2-14).  While these circumstances alone might be

insufficient to withstand summary judgment, they are certainly

relevant, and along with the other substantial evidence presented

_____

[15]     Defendant characterizes plaintiff's evidence as
"statistical evidence" that is insufficient due to the size and
content of the pool to constitute meaningful evidence of
discrimination.  However, plaintiff proffers this evidence in
addition to the evidence relating to his own encounters as
relevant to show discriminatory intent through corporate culture.
See Mangold v. California Pub. Utilities Comm'n, 67 F.3d 1470,
1476-77 (9th Cir. 1995).

1  by plaintiff, create a triable issue of fact of intentional

2  discrimination.  <u>Mangold</u>, 67 F. 3d at 1477 (citing <u>Price</u>

3  <u>Waterhouse v. Hopkins</u>, 490 U.S. 223, 251 (1989) ("[r]emarks at

4  work that are based on sex stereotypes fo no inevitably prove

5  that gender played a part in a particular employment decision . .

6  . [although] stereotyped remarks can be *evidence* that gender

7  played a part")).

8      Based upon the evidence submitted by plaintiff, there is a

9  triable issue of fact regarding whether defendant Forest

10 discriminated against plaintiff on the basis of age in violation

11 of FEHA.  As such, defendant Forest's motion for summary judgment

12 in regards to plaintiff's discrimination claim is DENIED.

13      **2.   Hostile Work Environment Claims**

14      Plaintiff asserts a claim of age harassment against

15 defendants Forest and Williams on the grounds that he was subject

16 to a hostile work environment in violation of FEHA.  FEHA makes

17 it unlawful for an employer to discriminate against a person in

18 the terms, conditions, or privileges of employment because of

19 that person's age.  Cal. Gov. Code § 12940(j) (West 2006).  To

20 survive summary judgment on a claim of hostile work environment

21 under FEHA, plaintiff must raise a triable issue of fact as to

22 whether

23      (1) []he was "subjected to verbal or physical conduct"
        because of [his age], (2) "the conduct was unwelcome,"
24      and (3) "the conduct was sufficiently severe or
        pervasive to alter the conditions of [plaintiff's]
25      employment and create an abusive working environment."

26 <u>Manatt v. Bank of America, NA</u>, 339 F.3d 792, 798 (9th Cir. 2003)

27 (quoting <u>Kang v. U. Lim Am., Inc.</u>, 296 F.3d 810, 817 (9th Cir.

28 2002).  Like Title VII, FEHA is not a general civility code.  <u>Id.</u>

28

1  (citing Faragher v. City of Boca Raton, 524 U.S. 775, 788

2  (1998)).  "Simple teasing, offhand comments, and isolated

3  incidents (unless extremely serious) will not amount to

4  discriminatory changes in the terms or conditions of employment."

5  Faragher, 524 U.S. at 788.  Rather, "[a] hostile work environment

6  claim involves a workplace atmosphere so discriminatory and

7  abusive that it unreasonably interferes with the job performance

8  of those harassed."  Brooks, 229 F.3d at 923.  Therefore, in

9  order to survive a motion for summary judgment, plaintiff must

10 present evidence that his "workplace [was] permeated with

11 discriminatory intimidation . . . that [was] sufficiently severe

12 or pervasive to alter the conditions of his employment and create

13 an abusive working environment."  Harris v. Forklift Sys., Inc.,

14 510 U.S. 17, 21 (1993); Fisher v. San Pedro Peninsula Hosp., 214

15 Cal. App. 3d 590, 608 (Cal. Ct. App. 1989).  Further, "[t]he

16 working environment must both subjectively and objectively be

17 perceived as abusive."  Fuller v. City of Oakland, 47 F.3d 1522,

18 1527 (9th Cir. 1995) (citing Harris, 510 U.S. at 21-22)).

19    The Supreme Court has warned that evidence of a hostile work

20 environment should not be viewed too narrowly; "[T]he objective

21 severity of harassment should be judged from the perspective of a

22 reasonable person in the plaintiff's position, considering 'all

23 the circumstances.'"  Oncale v. Sundowner Offshore Servs., Inc.,

24 523 U.S. 75, 81 (1998) (citing Harris, 510 U.S. at 23).  "The

25 real social impact of workplace behavior often depends on a

26 constellation of surrounding circumstances . . . which are not

27 fully captured by a simple recitation of the words used . . . ."

28 Id. at 81-82.  Such circumstances "may include the frequency of

29

the discriminatory conduct; its severity; whether it is
physically threatening or humiliating, or a mere offensive
utterance; and whether is unreasonably interferes with an
employee's work performance." Beyda v. City of Los Angeles, 65
Cal. App. 4th 511, 517 (Cal. Ct. App. 1998) (quoting Harris, 510
U.S. at 23). "The plaintiff must prove that the defendant's
conduct would have interfered with a reasonable employee's work
performance and would have seriously affected the psychological
well-being of a reasonable employee and that [he] was actually
offended." Id. (quoting Fisher, 214 Cal. App. 3d at 609-10).
"[T]he required showing of severity or seriousness of the
harassing conduct varies inversely with the pervasiveness or
frequency of the conduct." Ellison v. Brady, 924 F.2d 872, 878
(9th Cir. 1991) (citing King v. Board of Regents of Univ. of
Wisconsin Sys., 898 F.2d 533, 537 (7th Cir. 1990).

Defendants assert that plaintiff did not subjectively
perceive his work environment to be abusive. Defendants again
point to plaintiff's concession that his workload alone did not
create an intolerable working environment. As set forth above in
the court's discussion of plaintiff's claim of constructive
discharge, plaintiff has presented sufficient evidence that the
workload in conjunction with the alleged discriminatory comments
from Williams created the intolerable working environment.

Defendants also argue that the age-related comments by
Williams did not create a subjectively intolerable work situation
for plaintiff because plaintiff engaged in the same conduct.
Specifically, defendants point to an e-mail by plaintiff to
defendant with the subject heading "Very Old," wishing Williams a

1  happy birthday, and to an e-mail from plaintiff to defendant and
2  others, thanking them for a gift certificate and stating that "at
3  least I know how to make macaroni and cheese so I have something
4  to eat in my old age." (UF ¶ 53; Exs. DD-EE). Defendants rely
5  on the Tenth Circuit's opinion in MacKenzie v. Denver, 414 F.3d
6  1266 (10th Cir. 2005), for the principle that conduct that a
7  plaintiff personally engages in cannot create intolerable working
8  conditions for that plaintiff when engaged in by others. In
9  MacKenzie, the court characterized the conduct between the
10 plaintiff and her supervisor as "mutual bantering." Id. at 1281.
11 Further, in assessing the plaintiff's hostile work environment
12 claims, the court found that once the plaintiff complained about
13 her supervisor's comments, her employer immediately counseled the
14 supervisor and required him to make a public apology. Id. The
15 comments subsequently ceased. Id.

16      The facts of this case are distinguishable from the facts in
17 MacKenzie. In this case, the conduct between plaintiff and
18 Williams cannot be characterized as "mutual bantering."
19 Defendants point to one instance in July 2001 where plaintiff
20 addressed an e-mail to Williams entitled "Very Old." Further,
21 plaintiff admits that initially, when the comments began in late
22 2001, he believed that Williams was joking. However, the
23 comments became more frequent and more degrading, and persisted
24 from late 2001 until 2003 when plaintiff stepped down from his
25 position as Senior MSM under the supervision of Williams. The
26 court does not consider defendant's evidence of plaintiff's one
27 comment about defendant's age in July 2001 in relation to
28 plaintiff's evidence of defendant's consistent comments about

31

1  plaintiff's age over the next two and a half years to demonstrate

2  the type "mutual bantering" described in <u>MacKenzie</u>.  Similarly,

3  the court does not consider defendant's evidence of a single e-

4  mail, in which plaintiff stated "[i]t's hard to turn fifty, but

5  at least I know how to make macaroni and cheese so I will have

6  something to eat in my old age!," comparable to defendant

7  William's comments in front of clients implying that plaintiff

8  may lack the ability to do his job because of his age.  Further,

9  unlike in <u>MacKenzie</u>, after plaintiff complained about the

10  comments to Wolfe, nothing was done to investigate the merits of

11  plaintiff's complaints, and Williams was only spoken to in

12  general terms about the appropriateness of making anything other

13  than work-related comments.

14       Plaintiff presents evidence that his work environment was

15  subjectively intolerable.  Plaintiff asserts that after

16  approximately one year of enduring Williams' written and oral

17  references to his age, it began to affect his self-esteem, self-

18  confidence, and self-worth.  (Juell Aff. ¶ 35).  Plaintiff began

19  to doubt his own abilities which led to feelings of stress.

20  (Juell Aff. ¶ 35).  Plaintiff spoke to Wolfe and Williams about

21  the psychological and mental stress he was experiencing.  (Juell

22  Aff. ¶¶ 36-39).  The mental distress caused by Williams' comments

23  as well as plaintiff's workload rendered him unable to perform

24  his job as a Specialty Representative, after he left the MSM

25  position.  (Juell Aff. ¶ 41).  As a result of the mental

26  distress, plaintiff had a nervous breakdown and became disabled.

27  (Juell Aff. ¶ 42).  Plaintiff subsequently has been under the

28  care of a psychologist and a psychiatrist on a regular basis

1  since Summer 2003.  (Juell Aff. ¶ 43).  These facts are

2  sufficient to create a triable issue that plaintiff subjectively

3  perceived his working environment to be hostile.

4      Defendants also assert that plaintiff's working conditions

5  were not objectively abusive.  For the reasons set forth in the

6  court's discussion of plaintiff's claim of constructive

7  discharge, plaintiff has raised a triable issue of fact regarding

8  whether his working conditions were objectively intolerable.

9      Based upon the evidence submitted by plaintiff, there is a

10 triable issue of fact regarding whether defendants' conduct was

11 sufficiently severe and pervasive to create a hostile work

12 environment on the basis of age in violation of FEHA.  As such,

13 defendants' motion for summary judgment in regards to plaintiff's

14 hostile work environment claim is DENIED.

15     **3.   Failure to Prevent Discrimination**

16     Plaintiff contends that defendant Forest is liable for its

17 failure to investigate and take remedial action after plaintiff

18 notified Forest of Williams' conduct.  Section 12940(k) of the

19 California Government Code provides that it is unlawful "[f]or an

20 employer . . . to fail to take all reasonable steps necessary to

21 prevent discrimination and harassment from occurring."  Cal. Gov.

22 Code § 12940(k) (2006).  Defendants argue that this claim fails

23 because and for the same reasons that plaintiff's discrimination

24 and harassment claims fail.  As set forth above, there are

25 triable issues of fact regarding plaintiff's claims of

26 discrimination and harassment.  Further, plaintiff has presented

27 evidence that (1) he advised Williams of his concerns regarding

28 his unmanageable workload; (2) he advised MacDonald of his

33

1  concerns regarding his unmanageable workload; and (3) that he

2  advised Wolfe of both his concerns regarding his unmanageable

3  workload and his concerns regarding Williams' comments and focus

4  on plaintiff's age.  Plaintiff also spoke to his former

5  supervisor, Bley, about the age-related comments Williams had

6  been making.  However, plaintiff's workload remained unmanageable

7  and no one at Forest responded to plaintiff's complaints.

8  Further, the age-related comments continued.  (SDF ¶¶ 49-50).

9      Because plaintiff has raised triable issues of fact

10  regarding his discrimination and harassment claims,[16] and because

11  plaintiff has presented evidence that defendant Forest failed to

12  take adequate steps to prevent such conduct, defendant's motion

13  for summary judgment regarding plaintiff's claim for failure to

14  prevent discrimination is DENIED.

15  **B.   Wrongful Termination in Violation of Public Policy**

16      Finally, plaintiff asserts a common law state tort claim

17  against defendant Forest for wrongful termination in violation of

18  public policy.  Defendant argues that this claim should fail

19  because plaintiff's discrimination and harassment claims under

20  FEHA should fail.  However, because plaintiff has demonstrated

21  that there are triable issues of fact regarding his claims under

22  FEHA, plaintiff's claim for wrongful termination in violation of

23  public policy similarly survives defendant's motion for summary

24

25      [16]   Plaintiff argues that the California Supreme Court's
    recent opinion in Carter v. Cal. Dep't of Veteran Affairs, 38
26  Cal. 4th 914 (2006), casts doubt upon defendant's argument that
    plaintiff must prove an underlying discrimination claim an order
27  to pursue a claim under § 12940(k).  Because the court has found
    that there are triable issues regarding plaintiff's
28  discrimination and harassment claims, the court does not reach
    the merits of this issue.

judgment.   See Stevenson v. Superior Court, 16 Cal. 4th 880, 897 (1997) (holding that "FEHA's policy against age discrimination in employment is sufficiently substantial and fundamental to support a tort claim for wrongful discharge").   Therefore, defendant Forest's motion for summary judgment regarding plaintiff's claim for wrongful termination in violation of public policy is DENIED.

**CONCLUSION**

For the foregoing reasons, defendants' motion for summary judgment is DENIED.

IT IS SO ORDERED.

DATED: September 12, 2006

/s/ Frank C. Damrell Jr.
FRANK C. DAMRELL, Jr.
UNITED STATES DISTRICT JUDGE

35